AARON D. FORD
  Attorney General
MARAY GARAY (Bar No. 15550)
  Deputy Attorney General
State of Nevada
Office of the Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, Nevada 89119
(702) 486-3788 (phone)
(702) 486-3768 (fax)
Email: mgaray@ag.nv.gov

*Attorneys for Defendants Victor Castaneda Becerra,
Derrick Kelly, Jeremy Reese, Joseph Costello Jr.,
and Duane McCarthy*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TIMOTHY SANDERS, | Case No:  2:22-CV-01373-APG-EJY |
| Plaintiff, | |
| v. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| CASTANEDA, *et.al.,* | |
| Defendants. | |

Defendants, Victor Castaneda Becerra, Derrick Kelly, Jeremy Reese, Joseph Costello Jr., and Duane McCarthy, by and through counsel, Aaron D. Ford, Nevada Attorney General, and Mayra Garay, Deputy Attorney General, hereby moves this Court, pursuant to FRCP Rule 56, for an Order granting Summary Judgment.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    BACKGROUND OF THE CASE

This action is brought by *pro se* Plaintiff Timothy Sanders (Sanders), an inmate in the custody of the Nevada Department of Corrections (NDOC), pursuant to 42 U.S.C. § 1983. *See* ECF No. 12-2. After mandatory screening, Sanders is proceeding on (1) a First Amendment retaliation claim against Defendants Reese and Castaneda; (2) an Eighth Amendment claim based on deliberate indifference to his leg wound against Defendants Kelly, Reese, and McCarthy; (3) an Eighth Amendment excessive force claim against those same defendants and Defendants Castaneda and Costello; and (4) and Eighth Amendment sexual assault claim against Defendant Castaneda. ECF No. 12 at 10, 13-14, 16-17.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.      Sanders's Bed History

On January 5, 2022, Sanders was housed in Unit 11 at Southern Desert Correctional Center (SDCC). Ex. A at NDOC 0002. From January 6, 2022, to January 18, 2022, Sanders was housed in Unit 6, the infirmary unit, at SDCC. *Id.*; *see also* Ex. M at ¶6 (SDCC AW Decl.). Currently, Sanders is housed in High Desert State Prison. Ex. L at ¶6 (HDSP AW Decl.).

### B.      Inspector General Investigation Report

Sanders alleges Defendants used excessive force against him and that Castaneda sexually assaulted him by inappropriately touching his private area and inserting a finger into his rectum on January 6, 2022. ECF No. 12 at 17. This matter was extensively investigated by the Inspector General's Office. *See generally* Ex. B; Ex. L at ¶8 (HDSP AW Decl.). The matter was closed because the investigator found that Sanders's claims were unsubstantiated. Ex. B at NDOC 0651-52. The Investigation Report includes the reports by all SDCC staff who were involved in and witnessed this incident. *See generally* Ex. B.

Following a medical order to transport Sanders to a hospital, around 12:26 a.m. on January 6, 2022, Correctional Officers McCarthy and Reese were assigned to transport Sanders to Sunrise Hospital due to cuts on his shins caused by horseplay in his housing unit. Ex. A at NDOC 0158 (1/5/22 entry); Ex. B at NDOC 0642, NDOC 0646, NDOC 0648. During the transport, despite being secured in waist and leg restraints in the second row of a transport van, Sanders took off his seat belt, got up, and began erratically kicking the back side passenger door. *Id.* at NDOC 0642, NDOC 0646, NDOC 0648. Correctional Officer Reese gave multiple verbal commands to sit down and buckle his seat belt again, but Sanders did not comply, stating that he could not breathe and that he was having a panic attack. *Id.* at NDOC 0648. Despite claiming to have a panic attack while Correctional Officer Reese repeatedly ordered Sanders to sit back down and buckle his seat belt, Sanders instead tore off the panels of the back door and threw them against the side windows to break and exit the vehicle. *Id.* Sanders then hopped over the back seat to the rear door, while laying against the seat Sanders then proceeded to kick at the back right door. *Id.* Concerned that Sanders's violent actions would cause the transport van to tip over, Correctional Officer McCarthy pulled the transport van over and called Lieutenant (Lt.) Mustafaa to

inform him of the situation. *Id*. at NDOC 0642, NDOC 0646, NDOC 0648. Due to the severity of this situation, Lt. Mustafaa ordered Correctional Officer McCarthy to return the transport van to SDCC. *Id*. at NDOC 642, NDOC 0646, NDOC 0648.

Lt. Mustafa then immediately contacted Sergeant (Sgt.) Derrick Kelly, Correctional Officers Ernesto Castillo, Victor Casteneda, Morris Bailey, Carlin Taylor, and Correctional Nurse Jelom Manzan to have them assist Correctional Officers Reese and McCarthy upon the transport van's return. *Id*. at NDOC 0642. Several minutes later, the transport van arrived at the SDCC Sally Port. *Id*. at NDOC 0642. Sanders continually refused SDCC staff orders to stop kicking the van doors and windows. *Id*. at NDOC 0641-42 (reports by Correctional Officer Echeverria, assigned to the tower by the Sally Port, and Lt. Mustafaa), NDOC 646 (Correctional Officer McCarthy's report), NDOC 0647 (Correctional Officer Bailey's report), NDOC 0649 (Reese). After successfully breaking through the security frame/plates, screen, and window, Sanders dove through the van passenger side rear window. *Id*. at NDOC 0641-43 (Correctional Officer Echeverria's, Lt. Mustafaa's and Sgt. Kelly's reports), NDOC 0645-46 (Correction Officers Taylor's, Castaneda's and McCarthy's reports). Officer Bailey then deployed OC spray to gain compliance from the inmate. *Id*. at NDOC 0642 (Lt. Mustafaa's report), NDOC 0647 (Officer Bailey's Report). Sergeant Kelly and Officers Reese, McCarthy, Castenada and Bailey segmented the inmate. *Id*. at NDOC 0642 (Lt. Mustafaa), NDOC 0647 (Kelley), NDOC 0646 (Castenada), NDOC 0647 (McCarthy), NDOC 0647-48 (Bailey), and NDOC 0649 (Reese).

Because Sanders continued to be combative and repeatedly failed to comply with orders, Nurse Manzan contacted the on-call doctor and was ordered to administer a sedative. *Id*. at NDOC 0642-43 (Lt. Mustafaa), NDOC 0644 (Nurse Manzan), NDOC 0645 (Taylor). Correctional Officer Taylor escorted Nurse Manzan to the Sally Port in response to the call for medical assistance. Upon their arrival, Sanders continued to resist the officers' efforts to restrain him to prevent further injury to himself and others. *See id*. at NDOC 0642 (Lt. Mustafaa), NDOC 0644 (Nurse Manzan), NDOC 0645 (Taylor). Nurse Manzan administered medication to Sanders. *Id*. at NDOC 0642 (Lt. Mustafaa), NDOC 0644 (Nurse Manzan), NDOC 0645 (Taylor). Thereafter, Sanders was transported to the SDCC infirmary. *Id*. at NDOC 0642, NDOC 0644 (Nurse Manzan), NDOC 0645 (Taylor).

///

Due to Sanders's noncompliance and violent behavior, Sanders was kept in belly and leg constraints and was kept in an infirmary cell under video surveillance until Sanders woke up. *Id*. at NDOC 0644 (Summers). Because there was an additional officer to assist Officer Summers if Sanders were to become violent, Correctional Officer Summers removed Sanders's restraints and provided him with food. *Id*. Sanders was then seen by medical to evaluate any new injuries. Sanders was told that he would still need to go to the hospital for his knees. Sanders was sent back to the hospital later that day. *Id*.

In sum, none of the witnesses interviewed corroborated Sanders's excessive force or sexual assault allegations. *Id*. at NDOC 0640-50. Rather, the witnesses, all of whom were present at the time of the incident, confirmed Sanders was noncompliant and violent and as such, had to be restrained. *Id*.; *see also id.* at NDOC 0641-43, NDOC 0644-45, NDOC 0647-48, NDOC 0649-50 (nonparty correctional officers); *id*. at NDOC 0644 (nurse on duty). Their reports confirm the forced used was proportional to the threat Sanders posed at the time of the incident. *See id*. The photographs of the damage Sanders caused while being in both waist and leg restraints also clearly establish the officers used reasonable and proportionate force to restrain Sanders—who by his own admission failed to comply with repeated orders to stop and calm down. *See id*. at NDOC 0700-701.

Regarding the PREA investigation specifically, the Inspector noted the following:

- Officer Castaneda has no prior PREA allegations against him. *Id*. at NDOC 0657.
- Sanders did not mention bleeding from his anus the following morning until his PREA investigation interview. *See id*. at NDOC 0659.
- All witnesses present during the alleged sexual assault incident, denied that Officer Castenada inappropriately touched Sanders during this incident. *Id*. at NDOC 0660-66.
- Correctional Officer Taylor, a nonparty witness, explained that after the transport to the infirmary following the Sally Port incident, but prior to placing Sanders in the infirmary cell, Sanders's clothes were removed because he had been sprayed with OC spray. *Id*. at NDOC 0661. Sanders was provided with a blanket to cover himself. *Id*. Sanders was kept in the infirmary cell, which at no point during the remainder of Officer Taylor's shift was opened. *Id*.; *see also id*. at NDOC 0663 (Nurse Manzan also stating the infirmary cell door was not opened).

- Nurse Manzan offered Sanders the opportunity to shower, but Sanders declined it. *Id*. at NDOC 0663.

- Sanders never reported to Nurse Manzan that he was sexually assaulted. *Id*.

- Sanders did not indicate that he was bleeding from his anus when he awoke the hours after he had been taken to the infirmary. *Id*. at NDOC 0659.

- The PREA Investigator noted that "Sanders in the recorded phone calls is inconsistent when explaining what transpired during the incident. In the initial phone calls, he makes no mention of being sexually assaulted. It is not until January 14, 2022, that he mentions he was sexually assaulted." *Id*. at NDOC 0669.

- The PREA Investigator also noted that Sanders, in his initial grievance dated January 8, 2022, made no mention of bleeding from his anal cavity or that he was rapped." *Id*.; *see also id*. at NDOC 0677-97.  "Sanders did not mention he was bleeding from his anal cavity until he called the PREA Hotline on January 14, 2022." *Id*. at NDOC 0669.

- Sanders's allegations of sexual assault were found to be unsubstantiated. *Id*. at NDOC 0671.

### C.    Sanders's Medical Records

Although Sanders's medical file shows he has asthma, the medical order dated 1/5/22 indicates the order was issued **before** Sanders left SDCC to be transported to the hospital and also establishes that Sanders did not complain of breathing issues nor request his inhaler. Ex. N at ¶7; Ex. C at NDOC 0158, NDOC 0228.  The unusual incident report for Sanders's knee injury (January 5, 2022), which documented the reason for the hospital transport, shows he had a lacerated wound on his lower right knee, but was responsive and alert. *Id*. at NDOC 0256. Notably, there is no indication Sanders complained of any breathing difficulty that he was losing so much blood that he was not alert or that he was fainting. *See id*.; *see also* Ex. B at NDOC 0702 (photograph of Sanders's injury).

The unusual incident report regarding the Sally Port incident indicates medical staff received a call requesting help with an inmate who was to be transported to the hospital but was brought back to SDCC because he was kicking the van door and window. Ex. C at NDOC 0255. This report also establishes Sanders was provided a 50 mg injection of Benadryl. *See id*. He was also bandaged at 1:00 a.m. and given ibuprofen. *See id*. at NDOC 0158.

Sanders admitted that he was in an agitated state. *Id*. at NDOC 0158; *see also id*. at NDOC 0215 (Infirmary Observation Record).  NDOC also transported him to Sunrise Hospital for further treatment. *See id*. at NDOC 0158. Upon his return from the hospital, Sanders was again seen at the SDCC infirmary and prescribed the medication recommended by the hospital. *See id*.

During the following two weeks, Sanders was seen by medical to follow up on his shin injury, removing the staples, and referring him to mental health. *Id*. at NDOC 0165-68. Notably, medical records confirm Sanders was mutilating himself, resulting in a medical order being issued that he not be provided with any pens, books, windows, phones, spoons, or forks. *Id*. at NDOC 0156. On January 28, 2022, after Sanders refused to attend his scheduled January 24, 2022, appointment, Sanders was seen by medical specifically regarding his PREA complaint and there is no indication that they found any evidence to corroborate Sanders's allegations. *Id*. at NDOC 0163, NDOC 0217. Following this incident, Sanders was seen again on February 1, 2022, for having punched a glass window in a cell, lacerating his arm. *Id*. at NDOC 0163.

After this incident, there were other usual incident reports in which medical staff noted that Sanders was acting erratic and possibly under the influence of an unknown substance. *Id*. at NDOC 0250, NDOC 0252. Sanders was later transferred to High Desert State Prison's infirmary due to multiple attempts at self-mutilation. *See id*. at NDOC 0156, NDOC 0166-68. Sanders was referred to mental health services for mania. *Id.* Additionally, unusual incident reports dated prior to January 6, 2022, establish Sanders has previously been under the influence of an unknown substance. *See id*. at NDOC 0257.

**D.    Sanders's Property Records**

Sanders alleges Castaneda and Reese destroyed his property the day after the van transport incident. ECF No. 12 at 10. However, Sanders's property records indicate he received all his authorized property, and did not note that anything was missing. *See* Ex. D at NDOC 0634-35, NDOC 0639.

**E.    Grievance History**

Grievance records establish that Sanders submitted several grievances related to the January 6, 2022, incident. Sanders failed to grieve any of them through the second level of the grievance process as required in Administrative Regulation 740. *See* Ex. E at NDOC 0017-18, NDOC 0020-21, NDOC 0022-23 (property), NDOC 0024 (retaliation), NDOC 0025-26 (Grievance No. 2006-31-33568), NDOC 0027-

28 (Grievance No. 2006-31-33567), NDOC 0029 (property/retaliation), NDOC 0030-31 (Grievance No. 2006-31-33533).

Grievance No. 2006-31-33533 (first PREA grievance) was rejected three times at the informal level. *See generally* Ex. F. The first was rejected because Sanders's allegations of sexual assault would be addressed by the Inspector General, so he needed to file another informal grievance and a first level grievance stating that it was "for tracking purposes only." *Id*. at NDOC 0464 (or NDOC 0468), NDOC 0469-89. Sanders followed these instructions, *see id.* at NDOC 0492. However, his second informal grievance was rejected because Sanders failed to include all supporting documentation including the first rejection notice and DOC 3098 (Improper Grievance Memo). *Id.* at NDOC 0490, NDOC 0492. Despite a clear warning that his third attempt would be his final and that a failure to cure these deficiencies would constitute abandonment, Sanders's first-level grievance was also rejected because Sanders did not include all the supporting documents he was instructed to provide. *Id.* at NDOC 0494, NDOC 0542. Notably, Sanders did not appeal this grievance to the second level. *See id.* at 1-79.

Grievance No. 2006-31-333567 (duplicate of Grievance No. 2006-31-33533) was rejected twice at the informal level. *See* Ex. G at NDOC 0550, NDOC 0558. This grievance was initially rejected because it was duplicative of another grievance and was rejected a second time because sexual assault grievances are processed in a particular manner. *See id.*; *see id*. at NDOC 0552, NDOC 0560. Sanders was instructed to resubmit an informal grievance noting that it is "for tracking purposes only", as the matter was to be addressed by the Inspector General, and to simultaneously submit a first-level grievance also for tracking purposes only. *Id.* at NDOC 0558, NDOC 0560. Sanders did so, and his first-level grievance was denied. *Id.* at NDOC 0568, NDOC 0576. Notably, Sanders did not appeal this grievance to the second level. *See id*. at NDOC 0550-NDOC 0577.

Grievance No. 2006-31-33568 (duplicate of Grievance No. 2006-31-333567) was rejected noting that Sanders needed to file another informal grievance and a first-level grievance stating that it was "for tracking purposes only" because the matter would be addressed by the Inspector General. Ex. H at NDOC 0578-79. Sanders followed these instructions, *see id.* at NDOC 0584-85, and his first-level grievance was *partially* granted, *see id*. Notably, Sanders did appeal to the next level to the second level for this grievance. *See id*. at NDOC 0578-85.

## III.    SUMMARY JUDGMENT STANDARD

"Under Rule 56(c), summary judgment is proper 'if . . . there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp.*, 477 U.S. at 322 (quoting Fed. R. Civ. Pro. 56(c)). A fact is considered "material," for summary judgment purposes, if it "affect[s] the outcome of the suit." *Anderson*, 477 U.S. at 248. Accordingly, the substantive law determines the material facts. *Id.* ("[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs.").

A court considering summary judgment must decide if a genuine need for trial exists, "—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary Judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp.*, 477 U.S. at 323. Defendants moving for summary judgment "must either produce evidence negating an essential element of the [plaintiff's] claim . . . or show that the [plaintiff] does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Then, "[w]hen the moving party has carried its burden under Rule 56(c)," the burden shifts to the non-moving party who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

///

## IV.    LEGAL ANALYSIS

Summary judgment is proper because Sanders failed to exhaust his administrative remedies for his claims. Further, Sanders cannot establish an Eighth Amendment violation for sexual assault and Defendants are entitled to qualified immunity as to his Eighth Amendment claims for medical deliberate indifference and excessive force, as well as his First Amendment retaliation claim. Lastly, Sanders cannot establish that Defendants acted in wanton and willful manner as necessary to proceed with a claim for punitive damages. Accordingly, this Court should grant Defendants' motion for summary judgment in its entirety.

### A.    Sanders Failed to Exhaust his Administrative Remedies

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Ninth Circuit has clarified that § 1997e(a) requires complete exhaustion of administrative remedies before a civil complaint is filed. *McKinney v. Carey*, 311 F.3d 1198, 1199 (9th Cir. 2002). "Exhaustion subsequent to the filing of suit will not suffice." *Id*. (citing *Booth v. C.O. Churner*, 532 U.S. 731, 738 (2001)).

Exhaustion of administrative remedies requires an inmate to use "all steps the agency holds out and [to do] so properly." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedures because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91. Administrative Regulation (AR) 740 is the NDOC regulation adopted to address inmate grievances and "claims for personal property, property damage, disciplinary appeals, personal injuries, and any other tort or civil rights claim relating to conditions of confinement." Ex. L at ¶15; Ex. J at NDOC000825.

AR 740 contains three levels of grievance procedures an offender must use to exhaust the administrative remedy; that is, the informal level, a first level appeal, and a second level appeal. *Id*. at NDOC000833-37; Ex. K at NDOC000840-42. An offender must properly appeal the denial of a grievance at the informal level and first level to reach the second level. *Id*.; Ex. J at NDOC000835 (AR 740.08(12)(A)); *id*. at NDOC000837 (AR 740.09(5)(A)).  To complete the grievance process, an

offender must submit a second level grievance (Form DOC – 3094) and receive a response. *Id*. (AR 740.07). However, if the grievance was "granted" at any level, then the grievance process is considered complete, and the offender's administrative remedies are exhausted. *See id*. at NDOC000829 (AR 740.03(6)).  Notably, for grievances that are referred to the Inspector General, the inmate must complete all 3 steps of the grievance process even if his claim is being investigated. Ex. K at NDOC 000842.

An inmate's grievance "will not be accepted" for reasons "including, but not limited to" those contained in AR 740.03 and AR 740.04. Ex. J at NDOC000827-32. An inmate whose grievance is not accepted pursuant to AR 740 or not within the intended scope of AR 740 may not proceed to the next procedural level but must correct the issues that led to the rejection of the grievance, and follow the instructions provided on the Improper Grievance Memorandum DOC 3098. *Id*.

The record undisputedly establishes that Sanders did not complete the grievance process for any of his grievances related to the January 6, 2022, incident. *See supra* Section II(E). Specifically, Sanders did not proceed and complete the second level for any of the grievances related to the January 6, 2022, incident. *See id*. None of these grievances were "granted." *See id*. Accordingly, Sanders's claims are barred by the PLRA due to his failure to exhaust his administrative remedies.

**B.      Sanders Fails to Establish a Claim for Sexual Assault**

Sexual contact between a prisoner and a prison guard serves no legitimate role and "is simply not part of the penalty that criminal offenders pay for their offenses against society." *Wood v. Beauclair*, 692 F.3d 1041, 1050 (9th Cir. 2012) (quotation omitted). In sexual contact cases, "no lasting physical injury is necessary to state a cause of action" because "the only requirement is that the officer's actions be offensive to human dignity." *Schwenk v. Hartford*, 204 F.3d 1187, 1196 (9th Cir. 2000) (quotation omitted). Thus, to establish a claim for sexual assault, Sanders needs to show that the sexual assault actually occurred. *See Bearchild v. Cobban*, 947 F.3d 1130, 1143 (9th Cir. 2020) (explaining that "the subjective component of 'malicious and sadistic intent' is presumed if an inmate can demonstrate that a sexual assault occurred). Thus, to establish an Eighth Amendment claim due to sexual assault, a prisoner must "prove[] that a prison staff member, acting under color of law and without legitimate penological justification, touched the prisoner in a sexual manner or otherwise engaged in sexual conduct for the staff

member's own sexual gratification, or for the purpose of humiliating, degrading, or demeaning the prisoner." *Bearchild v. Cobban*, 947 F.3d 1130, 1144 (9th Cir. 2020).

Sanders's sexual assault claim fails because there is no evidence to substantiate it. By Sanders's own account, the alleged sexual assault occurred in front of many witnesses, and not one corroborated Sanders's allegations. ECF No. 12-2 at 12-13; Ex. C at NDOC 0641-42, NDOC 0644-45, NDOC 0647-50 (accounts of the incident by nonparties). Instead, these witnesses confirmed that Castaneda merely restrained Sanders's legs and/or feet. *See id.* Not one witness saw Castaneda inappropriately touch Sanders, including various non-parties to this action. *Id.*; *see also id.* at NDOC 0660-66; *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769 (2007) (upholding a district court's decision to grant summary judgment where "respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him").

Sanders essentially argues that he must have been sexually assaulted because he was left naked in an infirmary cell with just a blanket to cover himself following the incident near the van. ECF No. 12 at 4-5. The nurse who witnessed the van incident gave him the shot to calm him down, took him to the infirmary for further treatment, and informed Sanders he could take a shower because he was sprayed with OC spray. Ex. C at 13. His clothes needed to be removed because the spray was all over them. *See id.* Notably, Sanders did not claim he was sexually assaulted until days after the incident and his allegation that he was bleeding from his rectum on January 13, 2022, is the result of a self-inflicted injury as confirmed by his medical records. *See id.* at NDOC 0156. Accordingly, Sanders's sexual assault claim against Castaneda is without merit.

### C.    Defendants are Entitled to Qualified Immunity

In *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011), the Supreme Court held that "[q]ualified immunity shields . . . state officials from money damages unless a plaintiff . . . show[s] (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Id*. at 743. In *Reichle v. Howards*, 566 U.S. 658, 664, (2012), the Supreme Court explained that to "be clearly established, a right must be sufficiently clear "that every 'reasonable official would have understood that what he is doing violates that right.'" The "right

allegedly violated must be established, not as a 'broad general proposition,' but in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Id*. at 665. "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. at 664. "This 'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably anticipate when their conduct may give rise to liability for damages." *Id*.

In *Carley v. Aranas*, 103 F.4th 653 (9th Cir. 2024), this Court recognized that "the Supreme Court 'has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'" *Id*. at 660–61 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)). "It is not enough that a rule be suggested by then-existing precedent." *City of Tahlequah, Oklahoma v. Bond*, 595 U.S. 9, 12 (2021). "A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021). "This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id*. "Thus, to show a violation of clearly established law, [plaintiff] must identify a case that put [each defendant] on notice that his specific conduct was unlawful." *Id*. Officers "are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Kisela*, 584 U.S. at 104. "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id*. at 105. Accordingly, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. at 104.

The defense of qualified immunity protects state officials sued in their individual capacities from damages unless the conduct complained of violates a clearly established constitutional or statutory right of which a reasonable person would have known. *Jackson v. City of Bremerton*, 268 F.3d 646, 650 (9th Cir. 2001). Therefore, regardless of whether a constitutional violation occurred, state officers prevail if the right asserted by the plaintiff was not "clearly established" or if the state officers could have reasonably believed their conduct was lawful. *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). The Plaintiff bears the burden of proving that a right allegedly violated was clearly established at the time of the alleged misconduct. *Baker v. Racansky*, 887 F.2d 183, 186 (9th Cir. 1989) (citing *Davis*

*v. Scherer*, 468 U.S. 183, 197, 104 S. Ct. 3012 (1984)). When a public official acts in reliance on a statute or regulation, that official is entitled to qualified immunity unless the statute or regulation is "patently violative of fundamental constitutional rights." *Dittman v. California*, 191 F.3d 1020 (9th Cir. 1999) (quoting *Grossman v. City of Portland*, 33 F.3d 1200, 1210 (9th Cir. 1994)).

A reasonable but mistaken belief one's actions are lawful, based on facts or legal authority, entitles a defendant to qualified immunity. *Floyd v. Laws*, 929 F.2d 1390, 1394 (9th Cir. 1991). Qualified immunity shields government officials from suit against constitutionally deficient decisions that reasonably misapprehend the law; it extends to "all but the plainly incompetent or those who knowingly violate the law." *Mueller v. Auker*, 576 F.3d 979, 992 (9th Cir. 2009) (citations omitted). The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Dunn v. Castro*, 621 F.3d 1196, 1199 (9th Cir. 2010) (citations omitted.).

In *Schroeder v. McDonald*, the Ninth Circuit Court of Appeals discussed the importance of deciding immunity questions early on in the litigation. "The entitlement is an immunity from suit rather than a mere defense to liability; . . . it is effectively lost if a case is erroneously permitted to go to trial." *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995) (internal citations omitted). "The defense of qualified immunity protects 'government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id*. (internal citations omitted). "*[R]egardless of whether the constitutional violation occurred*, the officer should prevail if the right asserted by the plaintiff was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful." *Id*.

When conducting the qualified immunity analysis, district courts "ask (1) whether the official violated a constitutional right and (2) whether the constitutional right was clearly established." *C.B. v. City of Sonora*, 769 F.3d 1005, 1022 (9th Cir. 2014) (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 236, 129 S. Ct. 808 (2009)). The court may analyze the elements of the test in whatever order is appropriate under the circumstances of the case. *Pearson*, 555 U.S. at 240-42. Whether the right is established is an objective inquiry, and it turns on whether a reasonable official in the defendant's position should have known at the time that his conduct was constitutionally infirm. *Anderson v. Creighton*, 483 U.S. 635, 639-40, 107 S. Ct. 3034 (1987); *Lacey v. Maricopa Cnty*, 693 F.3d 896, 915 (9th Cir. 2012).

Stated differently, only where a state official's belief as to the constitutionality of his conduct is "plainly incompetent" is qualified immunity unavailable. *Stanton v. Sims*, 571 U.S. 3, 134 S. Ct. 3, 5 (2013) (per curium). Although the second inquiry is highly deferential, it is not necessary that the precise action has previously been held unlawful for a right to be "clearly established." *Anderson*, 483 U.S. at 640. Therefore, the Court must assess qualified immunity "'in light of the specific context of the case.'" *Tarabochia v. Adkins*, 766 F.3d 1115, 1121 (9th Cir. 2014) (quoting *Robinson v. York,* 566 F.3d 817, 821 (9th Cir. 2009)).

### 1.   No Constitutional Violation Occurred

As an initial matter, Defendant Costello was not on duty when the incident occurred. Because the evidence shows that he was not present, this Court should grant summary judgment in his favor. Ex. O at ¶6; *see Taylor v. List*, 800 F.2d 1040, 1045 (9th Cir. 1989) (personal participation is required under Section 1983). For the reasons explained below Defendants Kelly, McCarthy, Reese, and Castaneda are entitled to qualified immunity and as such, this Court should also grant summary judgment in their favor.

### a.   Eighth Amendment Excessive Force

The Eighth Amendment's proscription on cruel and unusual punishment forbids prison officials from imposing "the unnecessary and wanton infliction of pain . . . ." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). While the use of force is allowed in a prison setting, the Eighth Amendment bars the use of *excessive* force against prisoners. *See Hudson v. McMillian*, 503 U.S. 1, 7-10 (1992).

To determine whether the force used was unnecessary and wanton, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id*. at 7. Courts examine five factors in determining whether the use of force was malicious and sadistic: "(1) the extent of injury suffered by an inmate; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of the forceful response." *Hughes v. Rodriguez*, 31 F.4th 1211, 1221 (9th Cir. 2022) (quotation omitted).

There is no need to show the prisoner suffered a serious injury as a result of the force, but the lack of such an injury is relevant to the inquiry. *Hudson*, 503 U.S. at 7–9; *see also Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir.2003). Courts must give deference to prison officials when reviewing the use

of force and cannot substitute its own judgment for the judgment of prison officials. *Whitley*, 475 U.S. at 322; *Wood v. Beauclair*, 692 F.3d 1041, 1049-50 (9th Cir. 2012) (providing that courts must accord prison officials "wide-ranging deference" in making use-of-force decisions because such decisions are made "in in haste, under pressure, and frequently without the luxury of a second chance" (internal quotation marks omitted)). Unless the evidence supports a reliable inference of wantonness, the case should not go to the jury. *Whitley*, 475 U.S. at 322.

### i.    Extent of The Offender's Injuries

In an excessive force case, "[t]he extent of injury may also provide some indication of the amount of force applied." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). In cases where an inmate presents very minor injuries such as cuts or minor bruising, courts have frequently found that as a matter of law there is no evidence of "sadistic" or "malicious" intent to cause harm. *See Facchin v. Kelly*, No. 1:21-cv-00289-CDB(PC), 2022 WL 19297034, at *4 (E.D. Cal. Dec. 7, 2022), *report and recommendation adopted*, No. 1:21-cv-00289-ADA-CDB(PC), 2023 WL 2667353 (E.D. Cal. Mar. 28, 2023) ("Although a significant or serious injury is not necessary to state a claim for relief, the cut on Plaintiff's thigh was *de minimis* and insufficient to substantiate allegations that Sgt. Kelley acted with sadistic, malicious intent to cause harm when removing the pocket from Plaintiff's pants."); *Harris v. Parks*, No. 1:19-cv-00429-JLT-HBK(PC), 2022 WL 2110748, at *5 (E.D. Cal. June 10, 2022), *report and recommendation adopted*, No. 1:19-cv-0429-JLT-HBK(PC), 2022 WL 2488454 (E.D. Cal. July 6, 2022) (concluding that the alleged use of force was not excessive because of the "*de minimis* injuries suffered by Plaintiff" which included "a laceration when his clothing was cut off with a pair of scissors and . . . unspecified bone pains and bruises as a result of the incident"); *Bamdad v. Benov*, No. CV 13-00296-PSG (DFM), 2022 WL 1508977, at *5 (C.D. Cal. Feb. 14, 2022), *F. & R. adopted*, 2022 WL 1500993 (C.D. Cal. May 9, 2022) (holding that cut on wrist, resulting from handcuffing, healed in ten days did not satisfy the physical injury requirement); *see also Strickland v. Blackwell*, No. CV 9:18-0104-BHH-BM, 2019 WL 8918757, at *9 (D.S.C. Aug. 8, 2019), *report and recommendation adopted*, No. CV 9:18-104-BHH, 2020 WL 995128 (D.S.C. Mar. 2, 2020) (finding no excessive force where "the medical evidence submitted fails to show that Plaintiff suffered any significant injury (anything more than minor bruises and abrasions) as a result of this incident"). Notably, while the Supreme Court cautioned that courts must not solely rely

on a showing of injury to determine if a defendant acted maliciously and not in good faith when using force, the reasoning was to avoid a situation in which an inmate is "gratuitously beaten" but "has the good fortune to escape without serious injury." *Wilkins*, 559 U.S. at 38.

Here, there is no evidence to suggest Sanders suffered any further injury resulting from the alleged use of force incident on January 6, 2022. Ex. B at NDOC 0702-05; *see generally* Ex. C at NDOC 0158, NDOC 0255-56. The only injury noted in Sanders's medical records related to this incident was the deep cut on his right knee, which was the reason Defendants McCarthy and Reese attempted to transport Sanders to the hospital before the alleged excessive force incident occurred at the Sally Port on January 6, 2022. *See id*.

Notably, this case is distinguishable from the scenario set forth in *Wilkins*, as even by Sanders's account, Defendants did not "gratuitously beat" Sanders and was simply lucky enough to avoid causing him any further visible injuries. 559 U.S. at 38. By Sanders's own account, he was noncompliant and acting violently despite having been placed in waist and leg restraints during the transport, resulting in the need to return the van to SDCC. ECF No. 10 at 11 (""I then decided to cause a commotion . . . ."). Similarly, Sanders concedes he continued to act violently at the Sally Port, kicking the van window and jumping out of it. *Id*. at 12 ("I was losing consciousness again and kicked the window out to try and get some air . . .). Thus, even assuming Sanders's version of the incident is true, which Defendants dispute, the alleged use of force was reasonable to ensure safety and reestablish order and in response to Sanders's repeated noncompliance and violent actions, and as a result, there is no evidence of any significant injury caused by this reasonable use of force. *See Harris*, 2023 WL 9510740, at *12. Moreover, the fact Sanders did not have any additional injuries—besides the cut on his shin which was the cause for his need to be transported in the first place—resulting from this alleged incident corroborates Defendants' version of the incident, which is that Defendants used reasonable force to restrain him.

#### ii. Need for Application of Force

Force does not amount to a constitutional violation if it is applied in a good faith effort to restore discipline and order, and not maliciously and sadistically for the very purpose of causing harm. *See Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir.2002). While a correctional officer may not use excessive force, officers may use some measure of force if an inmate refuses a valid order or prison rule. *Whitley*,

475 U.S. at 320; *LeMarie v. Maass*, 12 F.3d 1444, 1452 (9th Cir. 1993). "[C]orrections officers must balance the need to maintain or restore discipline through force against the risk of injury to inmates." *Hudson*, 503 U.S. at 6 (internal quotation marks omitted). A prison official may use physical force to subdue an inmate who failed to comply with the official's instructions. *Strickland v. Blackwell*, No. CV 9:18-0104-BHH-BM, 2019 WL 8918757, at *9 (D.S.C. Aug. 8, 2019), *report and recommendation adopted*, No. CV 9:18-104-BHH, 2020 WL 995128 (D.S.C. Mar. 2, 2020). Further, "a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives," does not suffice to support a jury finding that prison officials restrained an inmate in this manner "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–322, 106 S.Ct. 1078.

Here, Defendants used reasonable force to reestablish order and for Sanders's own protection and care. Sanders, by his own account, was acting violently and repeatedly failed to comply with Defendants' lawful orders to stop and calm down. ECF No. 10 at 11-12. Defendants ordered Sanders to stop kicking the van door and side window, but Sanders did not comply. Ex. B at NDOC 0648. Following the order to return the transport van to SDCC, Sanders again refused SDCC staff orders to stop kicking the van doors and windows at the Sally Port. *Id.* at NDOC 0641-42 (reports by Correctional Officer Echeverria, assigned to the tower by the Sally Port, and Lt. Mustafaa), NDOC 646 (Correctional Officer McCarthy's report), NDOC 0647 (Correctional Officer Bailey's report), NDOC 0649 (Reese). Notably, Sanders was restrained in waist and leg restraints but was still capable of violently breaking the protective panel on the window, the screen, and the window itself. ECF No. 10 at 9 ("I was ordered into the van while in shackles, belly chains, and ankle chains."); *see also* Ex. B at NDOC 700-01.

In light of Sanders's violent, erratic behavior and repeated noncompliance, Defendants' use of OC spray and use of proportional force to restrain Sanders was not only reasonable but necessary and fully justified. Sanders fully admits he did not comply with Defendants' orders because in his lay opinion, he was having a panic attack. *See* ECF No. 10 at 11-12. After many repeated pleas and orders to get Sanders to comply went on deaf ears, and once Sanders succeeded in breaking the protective panel, screen, and side window of the transport van despite being in waist and leg restraints, nonparty Officer Bailey reasonably used OC spray on Sanders, and Defendants acted reasonably in restraining him when Sanders jumped out of the transport van window. *See* Ex. B at NDOC 0640-50, NDOC 700-01. Thus,

although the extent of the force used may be in dispute, Defendants were justified in using the amount of force used even viewing the dispute of the amount of force to Sanders's benefit as required. Sanders's violent and erratic behavior and repeated failure to comply with Defendants' orders, justified Defendants' use some force as objectively necessary to reestablish order and discipline. *See id.*; *see also* ECF No. 10 at 11-12 (Sanders conceding he did not follow orders).

                                  iii.     **Relationship Between the Need and Amount of Force Used**

Summary judgment is proper on an excessive force claim where "there is no evidence in the record showing that [the correctional officer] had any improper motive, let alone that he acted maliciously and sadistically for the very purpose of causing harm." *Simmons v. G. Arnett*, 47 F.4th 927, 933 (9th Cir. 2022) (internal citation and quotation marks omitted).  Plaintiffs have the burden to prove with evidence, not mere conclusory descriptions of the force used, that the amount of force used was unjustified under the circumstances and was in bad faith or malicious. *Strickland v. Blackwell*, No. CV 9:18-0104-BHH-BM, 2019 WL 8918757, at *10 (D.S.C. Aug. 8, 2019), *report and recommendation adopted*, No. CV 9:18-104-BHH, 2020 WL 995128 (D.S.C. Mar. 2, 2020); *see also Whitley*, 475 U.S. at 321 (Conduct only actionable where evidence shows it was taken "in bad faith and for no legitimate purpose"); *Williams*, 77 F.3d 761 (because prison officials are entitled to use appropriate force to quell prison disturbances, and because these officials oftentimes must act under pressure without the luxury of a second chance, in order for a prisoner to prevail on an Eighth Amendment claim he must demonstrate that officials applied force maliciously and sadistically for the very purpose of causing harm).

An offender's failure to comply with prison policies or orders may justify the use of force to gain compliance and ensure safety, particularly if the inmate was warned before force was applied. *See Banks v. McDonald*, 81 Fed. Appx. 227 (9th Cir.2003) (summary judgment on prisoner's excessive force claim was proper where prisoner was warned that refusing lawful orders to cuff up would result in being sprayed, prisoner was sprayed six or seven times and the correctional officer stopped spraying once the prisoner complied). *Howard v. Nunley*, 465 F. App'x 669, 670 (9th Cir. 2012) (affirming summary judgment where "it is uncontested that Howard disobeyed an order to stop pounding on his cell door after he also received a warning that failure to comply would result in the use of pepper spray"). Thus, a correctional officer is justified in using physical force to subdue an inmate if the inmate failed to comply

with the correctional officer's instructions. *See Strickland v. Blackwell*, No. CV 9:18-0104-BHH-BM, 2019 WL 8918757, at *9 (D.S.C. Aug. 8, 2019), *report and recommendation adopted*, No. CV 9:18-104-BHH, 2020 WL 995128 (D.S.C. Mar. 2, 2020).

As explained in Section C(1)(a)(ii), the evidence shows Defendants' reasonable and proportional use of force was justified because Sanders repeatedly failed to comply with several orders, and he repeatedly acted violently. *See* NDOC 0641-42 (reports by Correctional Officer Echeverria, assigned to the tower by the Sally Port, and Lt. Mustafaa), NDOC 646 (Correctional Officer McCarthy's report), NDOC 0647 (Correctional Officer Bailey's report), NDOC 0648, NDOC 0649 (Reese); ECF No. 10 at 11-12 (conceding failure to follow orders).

Even after Sanders refused to comply with Defendants' orders to stop kicking the van doors and window during the attempted transport, Defendants still attempted to use verbal orders to get Sanders to comply and avoid using force. *See id.* Instead of calming down and complying with the Defendants' orders, Sanders broke the protective panel, screen, and window. *See id.*

While the parties may dispute the degree of force that should have been used, both agree force was only used after Sanders refused to comply with the Defendants' repeated orders. *See id.*; *see also* ECF No. 10 at 11-12 (conceding failure to follow orders). Notably, the record shows it was a nonparty who deployed OC spray on Sanders, not Defendants, and that the use of the OC spray did not bring about compliance. Ex. B at NDOC 0642. Even crediting Sanders's assertions that he was physically restrained and sprayed with OC—particularly when there is no evidence those actions caused any significant injuries—these actions do not constitute *excessive* force because it's the incidental byproduct of an attempt to restrain an uncooperative inmate. *See Haywood*, 2012 WL 43612, at *3. Moreover, assuming Sanders's allegations that Defendants physically restrained him, "a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives," does not suffice to support a jury finding that prison officials restrained an inmate in this manner "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–322, 106 S.Ct. 1078. Thus, Sanders is unable to provide any evidence that Defendants acted maliciously or sadistically because their use of force was justified. *See Strickland v. Blackwell*, No. CV 9:18-0104-BHH-BM, 2019 WL 8918757, at *10 (D.S.C. Aug. 8, 2019). This is particularly true given Sanders's repeated failures to comply with verbal orders,

and after being OC-sprayed, but instead continued to escalate the situation by kicking out the van window.

iv.   **Threat Reasonably Perceived by Prison Officials**

Offenders are required to immediately obey a correctional officer's orders. *See Brown v. Williams*, No. 1:09-CV-00792, 2011 WL 386852, at *6 (E.D. Cal. Feb. 3, 2011), *report and recommendation adopted*, No. 1:09-CV-00792-LJO, 2011 WL 1344564 (E.D. Cal. Apr. 8, 2011). "Prisoners do not enjoy the right to engage in a "no[n] immediate threat protest" of a lawful order nor do prisoners enjoy a right to give counter demands to officers' lawful orders." *Id*. (quoting *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir.1984)). "Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them." *Soto*, 744 F.2d at 1267. Intermediate uses of force, such as using a taser, OC spray, and physical force to restraint, to restrain a noncompliant inmate is justified because officers are "forced to make split-second judgments in circumstances that [were] tense, uncertain, and rapidly evolving." *Hyde v. City of Willcox*, 23 F.4th 863, 870 (9th Cir. 2022).

Under AR 405, force should be proportionate to the threat by the inmate. Ex. L at ¶14; Ex. I at 405.03(2). Levels of force, from less to more, include physical force, chemical agents, hand-held batons, less lethal projectile weapons, and lethal weapons. *Id*. at AR 405.03(9). "To compel an inmate's compliance with orders, force may be used if no alternative method of persuasion is effective or where the circumstances require urgency." *Id*. at AR 405.03(6).  Physical force, including "self-defense and inmate control techniques or strikes to areas of the body unlikely to result in serious physical injury," may be used "to move inmates who fail to comply with lawful orders." *Id*. at AR 405.05(2)(A).

Here, Defendants appropriately responded to Sanders's violent acts and repeated noncompliance, as those actions were objectively and reasonably perceived as a serious threat. Sanders concedes he failed to comply with repeated orders to stop kicking and shouldering the van doors and windows. ECF No. 10 at 11-12. The undisputed evidence establishes, and Sanders concedes, that despite being restrained in waist and leg chains, Sanders broke the van protective panel and window. *See id*. at 9; Ex. B at 700-01.

Thus, Defendants acted objectively reasonably by physically restraining Sanders when he jumped out of the van, as it was appropriate force to ensure Sanders did not pose any further threat, as his physical actions firmly establish that his physical strength allowed him to break the van's protective panel and

window, despite being in shackles, and he had also repeatedly failed to comply with legal and appropriate orders. *See Hyde v. City of Willcox*, 23 F.4th 863, 870 (9th Cir. 2022);Ex. B at 700-01; ECF No. 10 at 11-12 (Sanders's concession of noncompliance). While Sanders may attempt to argue Defendants used too much force, that argument does not create a genuine factual issue under the circumstances.  As noted, Sanders's repeatedly failed to follow verbal orders, continue to resist even after being OC-sprayed, and was able to cause significant physical damage to the transport van despite being in physical restraints. *See id.*; *see also* Ex. B at NDOC 0640-50. Notably, there is no evidence Defendants used excessive force because there is no evidence Sanders received any medical treatment for any injuries besides his knee injury which he caused before the alleged excessive force incident. *See generally* Ex. C; Ex. I at AR 405.11(1).

### v.   Any Efforts to "Temper the Severity of a Forceful Response"

Physical force applied as a good faith response to a threat reasonably perceived by prison staff, with no alleged injury, is not excessive force. *Haywood v. Ramon*, No. 1:10-CV-01808-MJS PC, 2012 WL 43612, at \*3 (E.D. Cal. Jan. 9, 2012). There is no excessive force where "[t]he force applied . . . was proportionate to the need." *Royal v. Boone*, No. 4:19-CV-1993, 2023 WL 9112207, at \*11 (M.D. Pa. Aug. 29, 2023), *report and recommendation adopted*, No. 4:19cv1993, 2024 WL 69155 (M.D. Pa. Jan. 5, 2024). The need for use of force is established when an offender's failure to comply with an order because such behavior creates a disturbance in an environment that requires discipline and order. *Danley v. Allen*, 540 F.3d 1298, 1307–1308 (11th Cir. 2008), *overruled in part on other grounds as recognized by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010). "[P]rison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out. Certainly they are not required to do so where an inmate repeatedly fails to follow those orders." *Id.* at 1307.

Sanders created the need for Defendants to use reasonable force by acting violently and refusing to comply with lawful orders. *See* Ex. B at NDOC 0640-50; ECF No. 10 at 11-12 (Sanders conceding noncompliance). Defendants attempted to get Sanders to comply with their verbal orders, but Sanders continued to act violently and erratically. *See* Ex. B at  NDOC 0640-50. Sanders continued to disobey and even furthered his violent acts, breaking the protective panel and van window. *See id.* Accordingly, the record shows, and Sanders concedes, that there was a need of use of force due to Sanders's

noncompliance. *Id*. Defendants used proportional force to restrain him once he jumped out of the van window. *See id*.

In sum, Sanders fails to establish a claim for excessive force. Objectively viewing Sanders's allegations, as a matter of law, none rise to the level of a constitutional violation. At the very worst, Sanders alleges Defendants used force to restrain him after he repeatedly failed to comply with orders and violently broke the protective panel and van window. Sanders thus fails to establish that Defendants acted maliciously and not in good faith. Sanders concedes that he failed to abide by Defendants' order, creating a disturbance that Defendants had to address and took several officers to do so despite the fact that Sanders was in waist and leg restraints. Defendants used verbal commands to try to temper and deescalated the situation, but Sanders not only continued to ignore these orders but escalated his violent actions, culminating in the destruction of the van's protective panel and window. To the extent there is a factual dispute on the extent of the force used during this incident, disputes over the reasonableness of the use of force or potential alternatives to the use of force are insufficient to show  the use of force was "maliciously and sadistically for the very purpose of causing harm." *Whitley*, 475 U.S. at 320–322.

**b.     Sanders Fails to Establish a Medical Deliberate Indifference Claim**

To state a claim for deliberate indifference to a serious medical need, Sanders must establish "(1) the existence of a serious medical need; and (2) that the defendants' response to the need was deliberately indifferent by showing (a) a purposeful act or failure to respond to a plaintiff's pain or possible medical need, and (b) harm caused by the indifference." *Windham v. Wofford*, 22-15387, 2023 WL 417907, at \*1 (9th Cir. Jan. 26, 2023) (citing *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). Sanders must allege indifference resulted in "further significant injury or the unnecessary and wanton infliction of pain." *Jett*, 439 F.3d at 1096 (internal quotations omitted).

When a prisoner alleges that delay of medical treatment evinces deliberate indifference, the prisoner must show that the delay led to further harm. *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (holding that "mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference"). Prison officials who know of a substantial risk to an inmate's health and safety are liable only if they responded unreasonably to the risk, even if the harm ultimately was not averted. *See Farmer v. Brennan*, 511 U.S. 825, 844, (1994); *see also*

*Peralta v. Dillard*, 744 F.3d 1076, 1087 (9th Cir. 2014). Non-medical staff do not act with deliberate indifference to an inmate's medical needs if they reasonably relied on medical staff's expertise to treat the inmate. *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1084 (9th Cir. 2013).

Sanders's medical deliberate indifference claim fails because he cannot show that the Defendants' actions related to his knee injury were unreasonable or demonstrated deliberate indifference. By Sander's own account correctional officers acted quickly to get him medical attention when Sanders was initially injured. ECF No. 10 at 8 (C/O Jones seen my bone and immediately called a man down. The nurse came to the unit with officers. . . ."). The record reflects that this part of his account is true. *See* Ex. C at NDOC 0158, NDOC 0256. Sanders received medical attention within minutes of his injury being reported. *See id.*; *see also* Ex. B at NDOC 0702-03.

It is undisputed that McCarthy and Reese are correctional officers, not trained medical staff. ECF No. 10 at 3, ¶¶2-3. There is no evidence that McCarthy or Reese, who are non-medical staff,  acted unreasonably because Sanders was seen and treated by medical before Defendants tried to take Sanders to the hospital as directed by medical staff. Ex. C at NDOC 0158, NDOC 0256; ECF No. 10 at 11-12. Because of Sanders's own violent, erratic, and noncompliant conduct during the transport, which Sanders concedes is true, Defendants were forced to return Sanders to prison before they could reach the hospital. Ex. B at NDOC 0640-50, NDOC 0702-03.

The unusual incident report regarding Sanders's knee injury establishes that the hospital trip was needed because Sanders had a lacerated wound on his lower right knee, and not for any other reason. *Id*. at NDOC 0256. Notably, there is no indication Sanders complained of having breathing difficulties, or that he was not alert or fainting due to blood loss. Indeed, any such allegations regarding blood loss are belied by the photograph of Sanders's knee injury. *See id.*; *see also* Ex. B at NDOC 0702 (photograph of Sanders's injury).

Upon the parties' return to SDCC because of Sanders's violent, erratic, and noncompliant behavior, Sanders continued to act violently, and Defendants were forced to restrain him. Ex. B at NDOC 0641-42 (reports by Correctional Officer Echeverria, assigned to the tower by the Sally Port, and Lt. Mustafaa), NDOC 646 (Correctional Officer McCarthy's report), NDOC 0647 (Correctional Officer Bailey's report), NDOC 0648, NDOC 0649 (Reese). Following this incident, Sanders was treated by

medical staff. Ex. C at NDOC 0158, NDOC 0255. There is no evidence that Defendants' restraint of Sanders caused Sanders any further harm. *Id*. Accordingly, Sanders's medical deliberate indifference claim against Defendants is without merit.

####      c.      Sanders Fails to Establish a First Amendment Retaliation Claim

A retaliation claim has five elements. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012). "First, the plaintiff must allege that the retaliated-against conduct is protected." *Id*. Filing or submitting a grievance, complaint, or lawsuit about prison conditions or alleged constitutional violations is protected conduct. *Entler v. Gregorie*, 872 F.3d at 1031, 1039 (9th Cir. 2017). The form that a prisoner's complaint takes—"even if verbal"—"is of no constitutional significance, and threats to sue fall within the purview of the constitutionally protected right to file grievances." *Id*.

Second, the plaintiff must allege that "the defendant took adverse action against [him]." *Watison*, 668 F.3d at 1114. "'The mere threat of harm can be an adverse action.'" *Id*. (brackets and emphasis omitted) (quoting *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009)). The third factor requires the plaintiff to "allege a causal connection between the adverse action and the protected conduct." *Id*.

"Fourth, the plaintiff must allege that the official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Id*. (quotation omitted). And the fifth factor requires the plaintiff to allege "that the prison authorities' retaliatory action did not advance legitimate goals of the correctional institution." *Id*. (quotation omitted).

Notably, an inmate must submit evidence to establish a link between the exercise of constitutional rights and the retaliatory action. *Pratt v. Rowland*, 65 F.3d 802, 806-07 (9th Cir. 1995). The plaintiff "must show that his protected conduct was the 'substantial' or 'motivating' factor behind the defendant's conduct." *Brodheim*, 584 F.3d at 1271 (citation and quotation marks omitted). A plaintiff's mere speculation that there is a causal connection is not enough to raise a genuine dispute of material fact. *See Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (citations omitted) (affirming grant of summary judgment where there was no evidence that defendants knew about plaintiff's prior lawsuit, or that defendants' disparaging remarks were made in reference to the prior lawsuit); *see also Nelson v. Pima Comm. College*, 83 F.3d 1075, 1081-82 (9th Cir. 1996) (citation omitted) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment").

Sanders's retaliation claim fails because it is premised on a retaliatory act that did not occur. There is no evidence that Castaneda or Reese took his property following the van incident. *See* Ex. D. Sanders's property records indicate that they inventoried his property on January 6, 2022, the date of the incident, because Sanders was hospitalized following the incident. *Id*. at 0634-35, NDOC 0639. Notably, Sanders's property records show he received all his authorized property and did not note that anything was missing. *See* Ex. D at NDOC 0634-35, NDOC 0639. Thus, even if taken as true, Sanders's retaliation claim would fail because while he claims that Defendants took his property almost immediately following his leave for the hospital, Sanders did not file his first PREA grievance against them until January 8, 2022, two days after he claims the retaliatory act occurred. *See id*. at 0634-35, NDOC 0639; Ex. F at NDOC 0469-89. Accordingly, Sanders's retaliation claim is without merit and Defendants are entitled to qualified immunity on this claim.

### 2. No Clearly Established Constitutional Right Exists

Should this Court find there is a question of fact as to whether a constitutional violation of the Eighth Amendment or First Amendment has occurred, based on Sanders's allegations, qualified immunity is still appropriate because there is no case that would put Defendants on "clear notice" that his actions in this particular case violated Sanders's constitutional rights.

Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Qualified immunity is not available to an official "when it would be clear to a reasonable officer that his conduct was unlawful in the situation he was confronted." *Id*. at 746 (quoting *Saucier v. Katz*, 533 U.S. 194, 202, overturned in part on different grounds by *Pearson*, 555 U.S. 223). Additionally, qualified immunity "would be defeated [only] if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the plaintiff." *Id*. at 349 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800 (1982)) (internal quotation and emphasis omitted).

///

///

**a.    Excessive Force**

As explained above, courts considering similar circumstances—*i.e.*, offender noncompliance and reasonable use of force in response—have found that judgment in favor of the defendant or dismissal of the excessive force claim is warranted. *See Howard v. Nunley*, 465 F. App'x 669, 670 (9th Cir. 2012) (affirming summary judgment based on qualified immunity where "it is uncontested that Howard disobeyed an order to stop pounding on his cell door after he also received a warning that failure to comply would result in the use of pepper spray"). Defendants acted in good faith when they restrained Sanders because by his own account, he was noncompliant and acting violently. ECF No. 10 at 11-12; *Whitley v. Albers*, 475 U.S. 312, 320 (1986) (no constitutional violation if force is applied in a "'good faith effort to maintain or restore discipline'" (citation omitted)).

Even assuming Sanders's allegation that Defendants used more force than necessary is true, Sanders still cannot establish that such conduct clearly constitutes excessive force in violation of the Eighth Amendment. Force used to address a safety concern after an offender fails to abide by verbal commands (and OC spray) is justified. *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir.2002) (holding that the use of two five-second bursts of pepper spray was not excessive when used to break up a fight among inmates after they had repeatedly ignored verbal commands to stop). "Officials cannot realistically be expected to consider every contingency or minimize every risk[.]" *Whitley v. Albers*, 475 U.S. 312, 325 (1986). Consequently, "a mere dispute over the reasonableness of a particular use of force or the existence of arguably superior alternatives," is not sufficient to support a jury finding that prison officials acted maliciously and sadistically for the very purpose of causing harm. *Id.* at 322.

Thus, even if Defendants could have used less force during this incident, because Sanders was repeatedly noncompliant and violent, any such use of force would be the incidental byproduct of Sanders's own actions and is not sufficient to create a factual dispute on whether Defendants' conduct was malicious, sadistic, or for the purpose of causing harm. Therefore, this Court should grant summary judgment in Defendants' favor because they are entitled to qualified immunity as to Sanders's excessive force claim.

///

///

### b.   Retaliation Claim

As explained above, Defendants could not have violated Sanders's First Amendment right to submit grievances against them because the alleged retaliatory act of destroying or unlawfully taking his property occurred before he submitted his first grievance on this issue. *See Pratt v. Rowland*, 65 F.3d 802, 806-07 (9th Cir. 1995) (an inmate must submit evidence to establish a link between the exercise of constitutional rights and the retaliatory action); *Brodheim*, 584 F.3d at 1271 (plaintiff "must show that his protected conduct was the 'substantial' or 'motivating' factor behind the defendant's conduct") (citation and quotation marks omitted)). Thus, even if taken as true, Sanders's retaliation claim would fail because he claims that Defendants took his property almost immediately following his leave for the hospital, but Sanders did not file his first PREA grievance against them until January 8, 2022, two days after he claims the retaliatory act occurred. *See* Ex. D at NDOC 0634-35, NDOC 0639; Ex. F at NDOC 0469-89. Accordingly, Sanders cannot establish that

### c.   Medical Deliberate Indifference Claim

As explained above, Defendants, who are non-medical staff, did not act with deliberate indifference to Sanders's leg wound or asthma needs. *Farmer v. Brennan*, 511 U.S. 825, 844, (1994); *see also Peralta v. Dillard*, 744 F.3d 1076, 1087 (9th Cir. 2014) (Prison officials who know of a substantial risk to an inmate's health and safety are liable only if they responded unreasonably to the risk, even if the harm ultimately was not averted.); *see also Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (holding that "mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference"). The record shows that Defendants acted reasonably to Sanders's medical needs because Sanders was seen by medical staff for his self-induced leg injury within minutes of it being reported and before Defendants attempted to transfer Sanders to the hospital. Ex. C at NDOC 0158, NDOC 0256. Although Sanders's medical file shows that he has asthma, the medical order dated 1/5/22 at 22:10, which is military time for 10:10 p.m., *i.e.*, before Sanders left SDCC to be transported to the hospital does not indicate that Sanders complained of breathing issues or requested his inhaler before being transported to the hospital. Ex. C at NDOC 0158, NDOC 0228, NDOC 0256. Moreover, Sanders was seen and treated following the alleged excessive force incident and no further injuries were noted. *See i*d. at NDOC 0158, NDOC 0255. As non-medical staff Defendants reasonably

relied on the medical staff's treatment of Sanders before and after the alleged excessive force incident. *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1084 (9th Cir. 2013). Accordingly, Defendants are entitled to qualified immunity as to Sanders's medical deliberate indifference claim.

### D.      Sanders's Punitive Damage Claim Fails

In Nevada, "punitive damages may be awarded when the plaintiff proves by clear and convincing evidence that the defendant is 'guilty of oppression[;] fraud[;] or malice, express or implied.'" *Peters v. Swift Transportation Co. of Arizona, LLC*, No. 2:19-cv-00874-GMN-EJY, 2023 WL 375985 at *4 (D. Nev. Jan. 23, 2023) (citation omitted). "'Malice, express or implied' means conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others." *Russo v. Duracell, Inc.*, No. 2:21-cv-01403-GMN-DJA, 2022 WL 960591 at *3 (D. Nev. Mar. 29, 2022) (*citing* NRS 42.001(3)). "'Conscious disregard' means the knowledge of the probable harmful consequences of a wrongful act and a willful and deliberate failure to act to avoid those consequences." *Id.* (*citing* NRS 42.001(1)).

Here, there is no evidence that Defendants violated any of Sanders's constitutional rights or that they acted with malice or in conscious disregard of his safety. There is no evidence to support Sanders's sexual assault allegations. All the eyewitnesses present during the incident asserted that Castenada did not inappropriately touch Sanders while he was being restrained due to his erratic, violent, and noncompliant behavior. *See* Ex. B at NDOC 0640-70. Further, Defendants' conduct does not constitute excessive force even if all of Sanders's excessive force allegations are credited as true. According to Sanders, at the very worst, Defendants physically restrained him after he repeatedly kicked and shouldered the back door and side window of the transport van and failed to comply with verbal orders to stop doing so. Even if Defendants' use of force was disproportionate, there is no evidence that Sanders was injured due to these actions and thus cannot be considered as malicious or in conscious disregard of Sanders's safety.

Additionally, McCarthy and Reese were not deliberately indifferent to Sanders's medical needs. Sanders was seen and treated by medical staff before Defendants attempted to transport him to the hospital for treatment of his leg injury. Sanders was also treated by medical staff after the alleged excessive force incident and no further injury was noted. Lastly, McCarthy and Reese did not retaliate

against Sanders due to his complaints against them as the alleged retaliatory act of unlawfully destroying or taking his property occurred before he submitted any complaints against them. Ex. D at 0634-35, NDOC 0639; Ex. F at NDOC 0469-89. In any case, Sanders's property records show that all his property inventoried on January 6, 2022, was returned to him. Ex. D at 0634-35, NDOC 0639. As a result, there can be no showing of the wanton and willful conduct necessary for Sanders to proceed with a claim for punitive damages.

## V.    CONCLUSION

Defendants are entitled to summary judgment in their favor. Sanders failed to exhaust his administrative remedies for any of his claims. On the merits, Sanders fails to establish an Eighth Amendment claim based on sexual assault—and again this claim was not exhausted. The overwhelming evidence on this incident shows that no improper contact occurred between Sanders and Castaneda.

Defendants are also entitled to qualified immunity as to all remaining claims. Sanders cannot demonstrate Defendants' conduct constitutes excessive force or that they clearly violated his Eighth Amendment right. Sanders cannot demonstrate McCarthy and Reese were deliberately indifferent to his medical needs, as Sanders was seen and treated by medical staff before and after the alleged incident, and there is no evidence of any injuries associated with the objectively reasonable force used. Sanders cannot establish that McCarthy and Reese retaliated against him as their alleged retaliatory act occurred before his alleged protected conduct. Lastly, because Sanders fails to show Defendants acted in wanton and willful manner as necessary for Sanders to proceed with a claim for punitive damages, this Court should dismiss Sanders's request for punitive damages. Accordingly, this Court should grant summary judgment in Defendants' favor on all claims.

DATED this 18th day of April, 2025.

AARON D. FORD
Attorney General

By: */s/Mayra Garay*
MAYRA GARAY (Bar No. 15550)
Deputy Attorney General
*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I certify that I am an employee of the State of Nevada, Office of the Attorney General, and that on April 18, 2025, I electronically filed the foregoing **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** via this Court's electronic filing system. Parties who are registered with this Court's electronic filing system will be served electronically.

> Timothy Sanders #1035382
> High Desert State Prison
> P. O. Box 650
> Indian Springs, NV  89070
> *Plaintiff, Pro Se*

> /s/ Andrea  Beckett
> ANDREA BECKETT, Employee of the Office of
> the Nevada Attorney General